```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

ARTHUR PRYOR,                             :

                    Petitioner,          :

          - against -                    :        OPINION

WILLIAM CONNOLLY,                        :        06 Civ. 1722 (DC)
Superintendent of Fishkill
Correctional Facility,                   :

                    Respondent.          :

- - - - - - - - - - - - - - - - - -x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/8/06

**APPEARANCES:**     ARTHUR PRYOR
                    Petitioner, Pro Se
                    Fishkill Correctional Facility
                    P.O. Box 1245
                    Beacon, New York  12508

                    ROBERT T. JOHNSON, Esq.
                    District Attorney, Bronx County
                    Attorneys for Respondent
                        By: Karen Swiger, Esq.
                            David S. Weisel, Esq.
                            Assistant District Attorneys
                    198 East 161st Street
                    Bronx, New York  10451

**CHIN, D.J.**

Pro se petitioner Arthur Pryor petitions this Court for
a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner
was convicted, following a jury trial in the Supreme Court of the
State of New York, Bronx County, of robbery in the first and
second degree and criminal possession of a weapon in the fourth
degree.  Petitioner was sentenced as a second felony offender to
concurrent terms of twelve years, six years, and one year,
respectively.

Petitioner contests his conviction on the following grounds: (1) the trial court violated his Sixth Amendment right of confrontation; and (2) he was denied effective assistance of appellate counsel.  For the reasons that follow, the petition is denied.

**BACKGROUND**

I.   **The Facts**

The following is a summary of the facts adduced at trial.

A.   **The Robbery**

On Sunday, August 29, 1999, Catherine Arez boarded a southbound Number 5 train at the Bronx 149th Street station to go to work in Manhattan.  (2/20/01 Trial Transcript ("Tr.") at 32-33).  When Arez entered the subway car, she saw only two other people -- a man and a woman.  (Id. at 34).  After the train doors closed, the man and woman proceeded to rob Arez.  (Id. at 41-54).  The man pulled out a pocket knife and held it against Arez's throat.  (Id. at 41).  While face-to-face with Arez, the man told Arez to give him everything she had.  (Id. at 42).  The woman on the train then proceeded to remove Arez's necklace, while Arez handed her rings over to the man.  (Id. at 45-46).  The robbers also took Arez's wallet, Metrocard, and sixteen dollars in cash.  (Id. at 46-50).  When the train reached the next stop at the 138th Street station, the man and woman exited the train.  (Id. at 52-53).

B.    **The Line-Up and Investigation**

When Arez arrived at work, she called the police.  (Tr. at 58-59).  The responding police officer informed her that Manhattan police did not have jurisdiction over a Bronx robbery, so Arez waited until later that evening to file an official complaint with the Bronx police.  (Tr. at 59-60).  The complaint contained information provided by Arez relating to the suspects' physical appearance -- including the male robber's height, weight, hair length, and clothing.  (Id. at 109-14).

The next day, August 30, 1999, Detective Kevin Spellman of the Bronx Robbery Squad visited Arez in her home to discuss her complaint.  (Id. at 146-47).  Spellman filled out a follow-up report detailing the suspects' physical appearance that he later referenced when requesting line-up fillers.  (Id. at 152).  On September 13, 1999, Spellman arrested petitioner and brought him down to the station to participate in a line-up.  (Id. at 198). At the line-up, Arez identified Pryor as the man who robbed her. (Id. at 61-62).

On September 17, 1999, an investigator, Nelson Lassalle, visited Arez at her home to interview her about the case.  (Id. at 66-67, 256).  Although Lassalle worked on behalf of Pryor's defense, Arez mistakenly believed that he worked for the District Attorney's office.  (Id. at 69-70).  During his one-hour visit, Lassalle listened to Arez recount the robbery twice and wrote an eleven-page statement summarizing what Arez told him.  (Id. at 72, 131).  Arez skimmed through the statement and

initialed corrections Lassalle had made.  (<u>Id.</u> at 72-74, 137).

## II.  **Procedural History**

### A.  **Grand Jury Proceedings & Defendant's Motion to Dismiss**

On September 24, 1999,[1] the prosecution presented its case against Pryor to a Bronx grand jury.  (10/4/1999 Hearing ("Hr'g") at 2).  The grand jury also heard testimony from Pryor and an alibi witness.  (<u>Id.</u>).  When the grand jury voted, however, the twelve-member panel could not unanimously agree on either an indictment or a dismissal.  (<u>Id.</u>).

Because of the grand jury's inaction, the prosecution sought permission from New York Supreme Court Justice Ruth Sussman to submit Pryor's case to a second grand jury panel, pursuant to N.Y. Crim. Proc. Law § 190.75(3), which permits the prosecution to apply to the court for permission to submit a charge to a new grand jury after the charge has been dismissed by a prior grand jury.  (<u>Id.</u>).[2]

_____

[1]     Respondent's brief, citing a February 26, 2000 N.Y. Supreme Court supplemental decision, lists the date of this event -- the first Grand Jury presentation -- as September 17, 1999.

[2]     N.Y. Crim. Proc. Law § 190.75(3) ("Grand jury; dismissal of charge") provides: "When a charge has so been dismissed, it may not again be submitted to a grand jury unless the court in its discretion authorizes or directs the people to resubmit such charge to the same or another grand jury.  If in such case the charge is again dismissed, it may not again be submitted to a grand jury."  The New York State Legislature enacted N.Y. Crim. Proc. Law § 190.75 to prevent prosecutors from abusing the grand jury system and defendants' rights by repeatedly and unfairly submitting a charge until a grand jury indicted.  <u>See, e.g.</u>, <u>People v. Morris</u>, 93 N.Y.2d 908, 910 (1999).

- 4 -

Although the first grand jury technically did not vote for a dismissal, the prosecution applied for permission under the statute in the event such inaction would be deemed equivalent to a dismissal. (12/21/2000 Hr'g at 10-14).

Justice Sussman noted the defense counsel's absence at the time of the prosecution's request, and the prosecution indicated that the defense knew of the prosecution's plan to request a new grand jury presentation. (10/4/1999 Hr'g at 2-3). Justice Sussman granted the prosecution's request, and a second grand jury panel unanimously voted for a true bill of indictment on October 26, 1999. (10/27/1999 Hr'g at 2).

On December 21, 2000, the New York Supreme Court held a hearing on Pryor's motion to dismiss based on the prosecution's purportedly improper presentation of Pryor's case to a second grand jury. (12/21/2000 Hr'g at 2). Pryor's counsel argued that the first grand jury's failure to indict was the equivalent of a dismissal, and that N.Y. Crim. Proc. Law § 190.75 gives a court discretion to re-present to a second grand jury in the event of a dismissal only when valid grounds exist, such as where there is new evidence. (Id. at 2, 4). In Pryor's case, his counsel argued, the prosecution lacked such valid grounds. (Id. at 4-5). The prosecution, however, contended that the grand jury's indecision was neither an indictment nor a dismissal and that thus it was not necessary to seek permission in the first place. (Id. at 23-24). Even if the grand jury's inaction was viewed as a dismissal, the prosecution argued that the case law requiring

new evidence was distinguishable from Pryor's case.  (Id.).

On January 25, 2001, the New York Supreme Court denied Pryor's motion to dismiss.  (1/25/2001 Hr'g at 13).

**B.   Huntley/Wade Hearing**

On February 14, 2001, New York Supreme Court Justice Troy K. Webber held a Huntley/Wade hearing.

A Huntley hearing determines whether a confession is admissible.  Here, the Huntley issue involved a statement Pryor made to Spellman in a car en route to the police station after his arrest on September 13, 1999.  (2/14/2001 Hr'g at 2-3). Pryor asked Spellman whether the robbery he was charged with involved a man and a woman.  (Id. at 8).  Because the prosecution did not give Pryor's counsel the required statutory notice of the prosecution's intent to use the statement, Justice Webber precluded the statement from trial.  (Id. at 115).

A Wade hearing determines whether an eyewitness identification is admissible.  During the Wade inquiry, Pryor's counsel called Arez to the stand to question her about statements she made to Lassalle, the defense investigator.  (Id. at 104). The prosecutor objected on the basis that the prosecution had not yet received a copy of the Lassalle statement.  (Id.).  Although the prosecutor acknowledged there was no legal obligation that Pryor's counsel hand over the statement, she argued "fairness" dictated that she see be able to see the statement to "responsibly respond."  (Id.).  Justice Webber denied the motion

to suppress Arez's identification at the police station line-up. (<u>Id.</u> at 112).

C.    **The Proceedings in the Trial Court**

The jury trial commenced on February 20, 2001, before Justice Webber. (Tr. at 2). Prior to opening statements, the prosecutor renewed her request for a copy of Lassalle's statement. (12/14-15, 20/2001 Hr'g at 271). Justice Webber instructed Pryor's counsel to provide the prosecution with any reciprocal discovery that same afternoon. (<u>Id.</u>).[3]

1.    **The Defense's Opening Statement**

During the defense's opening statement, counsel made a call to sympathy for her client, arguing that Pryor's arrest was a "tragedy," and that the jury should end the nightmare for him by finding him not guilty. (Tr. at 21). Additionally, his counsel argued that Arez mistakenly picked Pryor out of "a line-up of five fillers . . . who didn't look anything like Arthur Pryor." His counsel also emphasized that Pryor told police he did not know anything about the robbery. (<u>Id.</u>).

Later in the trial, the prosecution moved to introduce Pryor's statement to Spellman, asking whether the robbery for which he was being detained involved a man and a woman. (<u>Id.</u> at 174). The prosecution argued that the statement should be admissible in light of defense's opening remarks, which implied that Pryor did not know anything about the robbery. (<u>Id.</u>).

_____

[3]    Defense counsel and Justice Webber would later disagree over whether the reciprocal discovery instruction included the Lassalle statement. (Tr. at 119-20).

Accordingly, the prosecution contended, the defense opened the door for the prosecution to introduce the statement, which suggested Pryor did know something.  (Id. at 175).

The court did not admit the precluded evidence, but instead, struck the defense's entire opening statement.  (Id. at 184).  The court emphasized that it based its decision to strike the opening statement not only on the defense opening the door, but also on the improper sympathetic tone of the opening statement.  (Id. at 186).  Prior to the defense's direct case, Justice Webber instructed the jury to "disregard the entire opening statement made by [defense counsel]" and to not "draw any inferences one way or the other by [his] ruling."  (Id. at 249).

### 2.  Arez's Testimony

On direct examination, Arez described the physical appearance of the man who robbed her.  (Id. at 50-51).  During cross-examination, Pryor's counsel sought to point out minor inconsistencies between Arez's testimony and her reports to the police and Lassalle.  (Id. at 87-88, 105-08, 118-26).[4]

---

[4]     For instance, Arez testified that the male robber had on a black hooded sweatshirt, but in Spellman's report, he marked the suspect as wearing a plain black T-shirt.  (Tr. at 217). Arez also testified that the male robber weighed between 160 and 170 pounds, and later on cross-examination said the robber weighed between 160 and 180.  (Id. at 51, 122).  The Bronx police officer who took her initial complaint wrote the weight of the suspect as 160.  (Id. 111-12).  The initial complaint also indicated that only the female robber removed Arez's jewelry, but Arez testified that the male robber also removed some jewelry, as did Arez under orders from the male robber to do so.  (Id. at 101-04).

As Pryor's counsel proceeded to question Arez about what she told Lassalle during his visit to her home, the prosecution objected in a sidebar on the grounds that it still had not received a copy of the statement Lassalle took from Arez. (Id. at 119).  Pryor's counsel responded that she had not yet decided whether to call Lassalle, and only then would she need to turn the statement over.  (Id.).  At that point, defense counsel handed a copy over to the prosecution, and asked Arez to read the statement.  The prosecution, however, asked for a continuation to read over the statement first.  (Id. at 119-20).

Instead of granting a continuation, the court instructed the defense to proceed with its cross-examination of Arez without showing her the statement.  (Id. at 120).  Arez conceded that she told Lassalle the suspect weighed 180 to 190 pounds, which contradicted her earlier testimony of 160 to 170 pounds.  (Id. at 51, 122).  Counsel asked Arez about other minor inconsistencies between her testimony and Lassalle's statement, but Arez testified that she did not remember making those statements to Lassalle.  (Id. at 122-23, 125).

The defense later objected to the court's refusal to allow it to show Arez the Lassalle statement on cross-examination.  (Id. at 138).  The court responded that if defense wanted to use the statement for impeachment purposes, the defense should have provided a copy to the prosecution before cross-examination began.  (Id. at 139).  The court further reasoned that the objection was moot because the defense had already

accomplished its goal of impeaching the witness by questioning Arez about the statement's content.  (Id.).

At the conclusion of the trial, Justice Webber charged the jury on robbery in the first and second degree and criminal possession of a weapon in the fourth degree.  (Id. at 374-77).  On February 22, 2001, the jury found Pryor guilty on all charges.  (Id. at 393-94).  On April 12, 2001, Judge Webber sentenced Pryor as a second felony offender, to concurrent terms of imprisonment of twelve years, six years, and one year, respectively.

### D.   Petitioner's Direct Appeal

On February 3, 2003, Pryor, through Stanley Neustadter, Esq., assigned counsel from the Cardozo Appeals Clinic, a unit of the Benjamin N. Cardozo School of Law of Yeshiva University, filed a brief on direct appeal.  The brief raised three claims: (1) the indictment resulted from an improper re-presentation to a second grand jury; (2) the verdict was against the weight of the evidence; and (3) the trial court violated Pryor's right to a fair trial and his right to confront witnesses against him when the court refused to allow defense counsel to show Arez the statement she made to Lassalle.  In June 2003, petitioner filed a pro se supplemental brief alleging violation of his statutory right to a speedy trial.

On March 16, 2004, the Appellate Division affirmed.  See People v. Pryor, 5 A.D.3d 222 (1st Dep't 2004).  The court held that the weight of the evidence was not against the verdict and rejected petitioner's pro se supplemental speedy trial claim.

Id. at 222-23.  The court further found that petitioner had full opportunity at trial to cross-examine Arez about her statement to Lassalle, and that therefore Pryor's right to a fair trial was not violated.  Id. at 222.  Specifically, the court noted that "defendant questioned the victim extensively about her statement" and placed her inconsistent statements "squarely . . . before the jury in summation."  Id.  Finally, the court concluded that the second grand jury presentation was proper.  Id. at 223.  The court held that a failure to garner twelve votes to indict or dismiss was a legitimate reason for a second submission.  Id.

On July 19, 2004, the New York Court of Appeals denied petitioner's application for leave to appeal.  See People v. Pryor, 3 N.Y.3d 661 (2004).

On November 9, 2004, Pryor moved in the Appellate Division for a writ of error coram nobis due to ineffective assistance of appellate counsel.  Pryor argued that appellate counsel failed to raise two issues vital to his defense: (1) the trial court's error in striking defense's entire opening statement, and (2) the denial of due process caused by the second grand jury submission.

On May 19, 2005, the Appellate Division denied Pryor's application for a writ of error coram nobis.  On October 31, 2005, the New York Court of Appeals denied Pryor's application for leave to appeal the Appellate Division's denial of his application for a writ of coram nobis.

**E.   The Habeas Petition**

Pryor's habeas corpus petition, dated February 2, 2006, was received by this Court's pro se office on February 15, 2006. Respondent filed opposing papers on July 7, 2006.  Pryor filed a traverse on August 3, 2006.

**DISCUSSION**

I do not address the issue of exhaustion because I deny Pryor's petition on the merits.  Pryor asserts two principal claims, which I discuss in turn: (1) the trial court violated his Sixth Amendment right of confrontation; and (2) he was denied effective assistance of appellate counsel.

**I.   Confrontation Right**

Petitioner asserts that the trial court violated his Sixth Amendment confrontation right when it precluded defense counsel from using the Lassalle statement on its cross-examination of Arez. (Petition ("Pet.") at 10).

**A.   Applicable Law**

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to confront and cross-examine witnesses against him.  See Crawford v. Washington, 541 U.S. 36, 42 (2004).  A trial court, however, may impose limitations on this right.  See Delaware v. Vans Arsdall, 475 U.S. 673, 679 (1986).  In fact, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination."  Id.  As the Second Circuit has noted, "restrictions on a defendant's

presentation of evidence are constitutional if they serve
'legitimate interests in the criminal trial process,' . . . and
are 'not arbitrary or disproportionate to the purposes they are
designed to serve.'" <u>Roberts v. Scully</u>, 875 F. Supp. 182, 189
(S.D.N.Y. 1993)(quoting <u>United States v. Almonte</u>, 956 F.2d 27, 30
(2d Cir. 1992)), <u>aff'd</u>, 71 F.3d 406 (2d Cir. 1995).  So long as
"the jury is in possession of facts sufficient to make a
'discriminating appraisal' of the particular witness's
credibility," cross-examination is not improperly curtailed.
<u>United States v. Roldan-Zapata</u>, 916 F.2d 795, 806 (2d Cir. 1990)
(quoting <u>United States v. Singh</u>, 628 F.2d 758, 763 (2d Cir.
1980)).

 Even if a trial court erred in precluding evidence, a
habeas corpus writ would issue only if the petitioner
demonstrates that the erroneous evidentiary ruling deprived him
of a fundamentally fair trial.  <u>See</u> <u>Taylor v. Curry</u>, 708 F.2d
886, 891 (2d Cir. 1983).

 **2.   <u>Application</u>**

 Petitioner's contention that the trial court violated
his Sixth Amendment confrontation right is rejected on the merits
because petitioner had sufficient opportunity to question Arez
about her statement to Lassalle.

 Petitioner contends that because New York law did not
require defense counsel to turn over a copy of Lassalle's
statement to the prosecution before Arez's testimony, the court
deprived petitioner of a fair trial when it precluded defense

counsel from using the statement to impeach Arez.[5]  (Traverse at 4-8).  Petitioner specifically asserts that because defense counsel could not show the statement to Arez, the jury did not learn of "pivotal inconsistences" between Arez's physical description of the male robber to Lassalle and her testimony at trial.  (Id. at 8).  Petitioner maintains that the court's decision to exclude this document profoundly damaged his ability to confront Arez, whose credibility as the prosecution's sole witness was central to the defense's case.  (Id. at 11).

Contrary to petitioner's assertions, the jury did learn of inconsistencies between Arez's testimony and Lassalle's statement.  Indeed, she conceded some of these inconsistencies during cross-examination, even after the court refused to allow the defense to show Arez the Lassalle statement.  (Tr. at 122-25).  For instance, Arez agreed that she told Lassalle that the

---

[5]     Petitioner argues that, according to N.Y. Crim. Proc. Law § 240.45(2)(a), the defense did not need to turn over the Lassalle statement to the prosecution unless and until the defense planned to call Lassalle as a witness.  (Traverse at 5). N.Y. Crim. Proc. Law § 240.45(2)(a) requires that a defendant turn over any prior statement prepared by a witness that the defense plans to call.  N.Y. Crim. Proc. Law § 240.45(2)(a) ("After presentation of the people's direct case and before the presentation of the defendant's direct case, the defendant shall, subject to a protective order, make available to the prosecutor . . . (a) any written or recorded statement made by a person other than the defendant whom the defendant intends to call as a witness at the trial, and which relates to the subject matter of the witness's testimony.").  Here, Arez testified on the prosecution's direct case, and thus petitioner is correct that § 240.45(2)(a) did not require defense counsel to produce the statement.  Nonetheless, the trial court surely had the authority to order defense counsel to produce the statement at an earlier time, in the interest of justice and to avoid delay.  When defense counsel failed to comply, the trial court reasonably precluded defense counsel from showing it to the witness.

male robber's hair was "short," even though she had testified earlier on direct that his hair was "not combed" and "pulled out [as] if [he] ha[d] corn rows." (Tr. at 51, 122). Arez also conceded that she told Lassalle the robber weighed approximately between 160 and 180, which slightly varied from her earlier testimony of 160 and 170 pounds. (Id.).

In any event, the defense had sufficient opportunity to attack Arez's credibility in front of the jury. Although it might have been more effective for defense counsel to use the statement, the Sixth Amendment confrontation right only guarantees an opportunity to cross-examine an adverse witness; it does not guarantee the defense's preferred method of questioning or a particular level of effectiveness or success. See United States v. Owens, 484 U.S. 554, 559 (1988); Delaware v. Fensterer, 474 U.S. 15, 20 (1985).

The Supreme Court has held that a trial judge may reasonably limit cross-examination. See Van Arsdall, 475 U.S. 673, 679 (1986). Here, precluding the defense from showing Arez the Lassalle statement was reasonable, in light of the delay that would have been caused by granting prosecution's continuation request. The defense knew that the prosecution had previously requested a copy of the statement several times -- and the defense still failed to provide the statement. The Constitution promises criminal defendants a fair trial, not a perfect one. See, e.g., United States v. Hastings, 461 U.S. 499, 508-09

(1983).  Accordingly, petitioner's right to confrontation argument is denied.

## II.  Ineffective Assistance of Appellate Counsel

In his petition, Pryor repeats the claims he raised in his coram nobis application.  Pryor argues that he was denied effective assistance of appellate counsel because counsel failed to raise two meritorious issues on appeal: (1) the trial court's error in striking the defense's entire opening statement, and (2) the violation of due process caused by the second grand jury submission.  (Pet. at 5, 11-16).

### A.  Applicable Law

To prove ineffective assistance of counsel, petitioner must show that: (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) he was prejudiced by counsel's deficient performance.  See Strickland v. Washington, 466 U.S. 668, 686-88 (1984); United States v. Vegas, 27 F.3d 773, 777 (2d Cir. 1994).  To demonstrate prejudice, petitioner must show that, but for counsel's errors, there is a sufficient probability that the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694.

When the court applies the Strickland test, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  "The court's central concern is not with 'grad[ing] counsel's performance,' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular

- 16 -

proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" United States v. Aguirre, 912 F.2d 555, 561 (2d Cir. 1990) (internal citation omitted) (quoting Strickland, 466 U.S. at 696-97).

The Strickland test has been extended to claims of ineffective assistance of appellate counsel. See Smith v. Robbins, 528 U.S. 259, 285 (2000); see also Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Appellate counsel is not required to raise every non-frivolous issue on appeal. See Robbins, 528 U.S. 259, 288; see also Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) ("[I]ndeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."). Failure to raise an issue on appeal is only grounds for finding ineffective assistance of counsel when that issue is clearly a better argument than the issues raised. Mayo, 13 F.3d at 533. Accordingly, to show that appellate counsel was ineffective, petitioner must prove that counsel not only failed to raise "significant and obvious" issues, but pursued claims that were "clearly and significantly weaker." Id.

**B.   Application**

Petitioner's ineffective appellate assistance claim rests on the Cardozo Appeals Clinic's omission of two issues: (1) the trial court's alleged error in striking the defense's entire opening statement, and (2) the alleged violation of due process caused by the second grand jury submission. (Pet. at 5, 11-16).

- 17 -

### 1.   <u>Striking Defense's Opening Statement</u>

The trial court struck the opening statement based on the combination of the opening's allegedly improper argumentative tone and its denial of any knowledge on Pryor's part of the robbery.

New York law allows a judge to curtail an opening statement if the statement exceeds the bounds of a proper statement.  <u>See</u> <u>People v. Green</u>, 268 A.D.2d 443 (2d Dep't 2000); <u>People v. Valentin</u>, 211 A.D.2d 509 (1st Dep't 1995).  An opening statement is not supposed to go beyond a brief outline of the facts counsel expect the evidence will show.  <u>Valentin</u>, 211 A.D.2d at 509.

The trial court's decision here to strike defense counsel's entire opening statement gives me pause.  The overall tone of the defense's opening statement was not troubling.  The defense's opening statement was not significantly more argumentative than the prosecution's opening statement.  Although case law recognizes that a trial court has discretion to strike offending portions or excerpts of an opening, the case law is silent on a judge's decision to strike an entire opening.  <u>See</u>, <u>e.g.</u>, <u>People v. Frazier</u>, 291 A.D.2d 211, 212 (1st Dep't), <u>lv. denied</u>, 98 N.Y.2d 675 (2002) (court properly curtailed defense's opening statement when it precluded defense from naming specific prosecution witnesses); <u>People v. Green</u>, 268 A.D.2d 443 (2d Dep't 2000) (trial court properly sustained "those <u>portions</u> of defense counsel's opening statement") (emphasis added).

Nonetheless, I do not believe that the trial court's decision to strike the defense's entire opening statement is a basis for habeas relief.  Defense counsel's opening was misleading to the extent it suggested that petitioner told the police he knew nothing about the robbery -- a contention contradicted by evidence that defense counsel knew the court ruled inadmissible.  The trial court's determination that some relief was warranted was reasonable.

It is well established in New York that a trial judge may allow the jury to hear otherwise inadmissible evidence if the adverse party "opens the door" by creating a misleading impression in the fact-finder's mind.  See People v. Massie, 2 N.Y.3d 179, 180 (2004); People v. Rojas, 97 N.Y.2d 32, 34 (2001). Here, the defense's opening included the following statement: "At the precinct, the police questioned [Pryor] about August 29 of 1999, and he told them he didn't know what they were talking about."  (Tr. at 21).  This created an impression that could lead a jury to believe that Pryor did not have knowledge of the crime throughout the arrest and line-up procedure.  The trial court, in its discretion, could have admitted Pryor's inculpatory statement to the police about the man-and-woman robbery.  See Massie, 2 N.Y.3d at 184 (reviewing cases that establish a "trial court should decided 'door-opening' issues in its discretion, by considering whether and to what extent, the evidence or argument said to open the door is misleading, and what if any otherwise admissible evidence is reasonably necessary to correct the

misleading impression").  In fact, the prosecution argued that the only appropriate remedy was to admit the statement into evidence.  (Tr. at 185-86).  The court, however, did not allow the precluded statement, and, instead, struck the defense's opening statement.  In view of the inculpatory statement's potential devastating effect on the defense's case, it was within the court's discretion to remedy the misrepresentation by striking the opening statement instead.

        Although trial court's decision to strike the entire statement, as opposed to striking the offending line, is troubling, I am not persuaded that petitioner's appellate counsel violated the Strickland standard when it omitted the issue from direct appeal.  Although the issue is non-frivolous, appellate counsel made a judgment call that is difficult to second guess on habeas review.  Further, I am not persuaded that petitioner was prejudiced.  This issue was not clearly stronger than the issues appellate counsel did raise, and the issue ultimately was raised in any event -- in petitioner's coram nobis application.  Moreover, the merits of the underlying claim are questionable, for petitioner has not shown that he was deprived of a fair trial by the court's decision to strike the opening statement.  First, the jury had an opportunity to hear the entire statement, which was largely factual.  Second, the trial court instructed the jury that an opening statement was not evidence.  (Tr. at 24).  Finally, the trial court did not strike the opening statement until the defense's direct case.  (Tr. at 249).

Thus, compared with the other three issues appellate counsel raised on direct appeal, the striking of the defense's opening statement was not a clearly stronger issue.

### 2.   Re-Presentation to a Second Grand Jury

Although petitioner's appellate counsel argued that the trial court abused its discretion by allowing the prosecution to improperly re-present to a second grand jury, petitioner contends that appellate counsel should have additionally argued that the re-presentation violated petitioner's due process rights.  (Pet. at 15-16).[6]  Specifically, petitioner alleges that the prosecution and the trial court did not follow the mandates of N.Y. Crim. Proc. Law § 190.75(3) for submitting a case to a second grand jury, and thus there was "a denial of due process of law."  (Traverse at 21).

The "due process" argument was not a clearly better argument than other issues raised on direct appeal.  First, the court's decision to allow a re-presentation to a second grand jury did not contravene the mandates of the statute, which grants the court discretion in authorizing a re-presentation.  See N.Y.

---

[6]    Respondent argues that petitioner's due process claim is unpreserved for review because petitioner failed to make a due process claim below.  While the petitioner did not specifically allege a due process violation, I find it preserved in light of petitioner's pre-trial motion to dismiss based on the re-presentation to a second grand jury.  See People v. Vidal, 26 N.Y.2d 249, 254 (1970) (noting that the goal of a specific objection requirement is to put the court on notice of possible defects); see also People v. Harris, 98 N.Y.2d 452.  In Harris, the court found that a one word objection does not allege a constitutional violation.  Harris, 98 N.Y.2d at 492.  In petitioner's case, his objection, as viewed through his pre-trial motion, went far beyond a one-word objection.

Crim. Proc. Law § 190.75(3).  Second, the petitioner cites no cases supporting his contention that such a re-presentation pursuant to § 190.75 violates his due process rights.  Finally, as petitioner himself notes, appellate counsel did have an opportunity to challenge the re-presentation as an abuse of discretion, just not as a due process claim.  Thus, a due process argument for re-presenting to a second grand jury would have had little utility on appeal and would not have improved petitioner's chances of reversal.  The law did not require Pryor's appellate counsel to raise every issue on appeal.

In sum, petitioner has failed to meet the requirements of the <u>Strickland</u> standard as it applies to appellate counsel. Petitioner has not shown that his appellate counsel omitted significant and obvious issues on appeal, nor has petitioner shown that the issues appellate counsel did pursue were clearly and significantly weaker.

<u>**CONCLUSION**</u>

For the reasons set forth above, Pryor's application for a writ of habeas corpus is denied and the petition is dismissed in its entirety.  Because petitioner has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability.  <u>See</u> 28 U.S.C. §

2253 (as amended by AEDPA).  I certify pursuant to 28 U.S.C. §

1915(a)(3) that any appeal taken from this decision would not be

taken in good faith.

       SO ORDERED.

Dated:     New York, New York
            November 8, 2006

                              DENNY CHIN
                            United States District Judge